IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| Marty Hierholzer, an individual; MJL Enterprises, LLC, a Virginia corporation,<br><br>Plaintiffs,<br><br>v.<br><br>Isabel Guzman, in her official capacity as Administrator of the Small Business Administration; Small Business Administration,<br><br>Defendants. | Civil Case No. 2:23-cv-00024 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.     This case is about the right of small business owner and Navy veteran Marty Hierholzer to equal treatment under the law.

2.     Marty is a service-disabled veteran and owner of MJL Enterprises, LLC (MJL), which contracts with the government to provide various services and supplies. He served his country with distinction as a Navy deep sea diver. He has persevered through mental and physical injuries suffered in that work with dignity and a determination to become a successful government contractor supporting the military.

3.     As a service-disabled veteran, Marty faces well-documented disadvantages—social, emotional, and physical.

4.     The Small Business Administration (SBA) Business Development Program—commonly known as the "8(a) Program"—purports to help small business owners who have faced social disadvantage with a host of benefits, including the chance to compete for contracts set aside

for eligible contractors. Yet the SBA has denied Marty the opportunity to participate in the program in part based on his race.

5.      The racial preferences and classifications in the 8(a) Program and implementing regulations transgress the Constitution's "simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (quotation omitted).

6.      The SBA, moreover, has arrogated to itself the power beyond its enabling legislation to craft its own system of racial preferences. Not only do the agency's race-based rules exceed statutory authority, they also make arbitrary and capricious distinctions among racial groups divorced from evidence and logic.

7.      To the extent Congress did in fact authorize the SBA to establish racial classifications and preferences, based not on findings of fact but unexamined policy judgments about race, Congress has abandoned its legislative prerogative, unconstitutionally delegating fundamental policy decisions and violating the Constitution's vesting legislative power exclusively in the legislative branch.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.

9.      The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

10.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims herein occurred in this District. Venue is also proper under 28 U.S.C. § 1391(e)(1)(B) because Defendants are officers, employees, and agencies of the

United States and a substantial part of the events or omissions giving rise to these claims occurred in this District. *See also* 5 U.S.C. § 703 (venue for actions under the Administrative Procedure Act are generally proper in "a court of competent jurisdiction").

## PARTIES

11.     MJL Enterprises is a limited liability company organized in the State of Virginia, owned and controlled by Marty Hierholzer. Its principal place of business is located in Virginia Beach, Virginia.

12.     Defendant SBA is a cabinet-level agency of the United States government.

13.     Defendant Isabel Guzman is the Administrator of the SBA. She is sued in her official capacity.

## GENERAL ALLEGATIONS

### Marty Hierholzer and MJL Enterprises

14.     In 2006, Marty Hierholzer started his business, MJL Enterprises, LLC (MJL), providing government contracting services primarily to the United States military. MJL is legally recognized as a small business under the terms of the 8(a) Program. As its sole owner, Marty remains its president and chief executive officer today.

15.     After serving twenty-two years in the Navy, Marty returned to civilian life with permanent injuries sustained in the line of duty. He is proud of his service and determined not to be held back by the injuries that classify him as a service-disabled veteran.

16.     Marty served the Navy as a saturation diver, deploying to countless countries to perform highly specialized work at depths of a thousand feet or more below sea level. Deep diving is among the most hazardous jobs, where the intense pressure is equally physical and mental. Alone, the processes of pressurization and depressurization required to work at such depths put

debilitating strain on divers' bodies. This is all in addition to the extraordinary pressures and perils of war.

17.     For commercial divers alone, the occupational fatality rate is forty times the national average for other professions.

18.     It is no surprise then that in the line of duty Marty sustained physical injuries to his knees, lower back, and shoulders; he suffers from hearing loss and tinnitus, along with decreased mobility. The mental impact from stressful events, including combat, accidents, and losing friends, resulted in clinically recognized depression and anxiety disorders.

19.     These injuries and disorders are recognized and documented by Veterans Affairs (VA), rendering Marty a service-disabled veteran in the eyes of the United States government. He is rated as 60% disabled by the VA.

20.     Marty retired as a Master Diver in 2002, the highest warfare qualification obtainable by a member of the U.S. Naval diving community.

21.     Since his life's work was centered on military service, it was only natural for Marty to start a business whose motto and mission is "serving those who serve." Marty remembers that while he was in the military, government contracting businesses would contract to supply goods or services to the troops, then sometimes fail to deliver, leaving the soldiers high and dry. Marty was determined that MJL would deliver dependably where others fell short.

22.     MJL provides medical, maintenance, and repair equipment to military bases and VA hospitals. MJL also delivers office supplies to VA hospitals and offices and high-tech safety and security equipment to first responders. Additionally, MJL provides logistical labor and personnel services for VA hospitals.

23.    MJL qualifies as a small business concern owned and controlled by a service-disabled veteran under 15 U.S.C. § 632 and related federal regulations.

24.    Marty has sought to use government programs designed to help service-disabled veteran business owners succeed, including through the VA.

25.    Because of Marty's veteran status, MJL qualifies for and participates in the VA's service-disabled veteran small business contracting program.

**The SBA 8(a) Program**

26.    The SBA's 8(a) Program offers valuable opportunities for MJL and Marty as a service-disabled veteran. He has, therefore, invested time and money to apply for the program, but without success.

I.    **The statutory framework**

27.    The 8(a) Program provides a host of benefits to socially and economically disadvantaged businesses, including access to exclusive government contracts set aside by the SBA and agencies with which it has partnership agreements.

28.    Section 8(a) authorizes the SBA to enter into agreements for goods and services with other government departments and agencies, and to subcontract the performance of those agreements to "socially and economically disadvantaged small business concerns." 15 U.S.C. § 637(a)(1)(A), (B). These contracts can be "sole source" (reserved to one Section 8(a) firm) or competitive within the 8(a) Program, such that only firms qualified for the 8(a) Program can bid. 13 C.F.R. § 124.501(b). The SBA has full discretion to administer this program as it deems "necessary or appropriate."

29.    The SBA has granted some federal agencies the authority to contract directly with 8(a) firms.

30.     The 8(a) Program is administered by the SBA and other agencies of the federal government pursuant to Section 8(a) of the Small Business Act (15 U.S.C. § 637(a)).

31.     The stated purposes of the 8(a) Program include "promot[ing] the business development of small business concerns owned and controlled by socially and economically disadvantaged individuals" and "clarify[ing] and expand[ing] the program for the procurement by the United States of articles, supplies, services, materials, and construction work from small business concerns owned by socially and economically disadvantaged individuals." 15 U.S.C. § 631(f)(2) (2010).

## II.     The statute's racial preference

32.     The statute defines socially disadvantaged individuals as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." *Id*. § 637(a)(5). Marty believed MJL would qualify for 8(a) participation because he has been subjected to "cultural bias" due to his status as a service-disabled veteran.

33.     "Economically disadvantaged individuals are those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities" and are thus a subset of the socially disadvantaged. *Id*. § 637(a)(6)(A). "Economically disadvantaged" is defined broadly enough that almost all small business concerns owned by a socially disadvantaged individual will be considered "economically disadvantaged."

34.     The statute also contains an additional racial classification in a presumption that all individuals who are members of certain racial groups are socially disadvantaged: "such groups

include, but are not limited to, Black Americans, Hispanic Americans, Native Americans . . . Asian Pacific Americans . . . and other minorities." *Id*. § 631(f).

### III.      The regulation's racial classifications

35.      In addition to the racial groups presumed socially disadvantaged under the statutory presumption, the SBA has designated by regulation that "Subcontinent Asian Americans" are presumptively disadvantaged. 13 C.F.R. § 124.103(b).

36.      The regulation also adds detail to the racial groups listed in the statute:

"Native Americans" are "Alaska Natives, Native Hawaiians, or enrolled members of a Federally or State recognized Indian Tribe."

"Asian Pacific Americans" are "persons with origins from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China (including Hong Kong), Taiwan, Laos, Cambodia (Kampuchea), Vietnam, Korea, The Philippines, U.S. Territory of the Pacific Islands (Republic of Palau), Republic of the Marshall Islands, Federated States of Micronesia, the Commonwealth of the Northern Mariana Islands, Guam, Samoa, Macao, Fiji, Tonga, Kiribati, Tuvalu, or Nauru."

37.      "Subcontinent Asian Americans," a group added exclusively by regulation, are "persons with origins from India, Pakistan, Bangladesh, Sri Lanka, Bhutan, the Maldives Islands or Nepal."

38.      The regulation does not specify what subgroups are included within "Black American" or "Hispanic American." However, the SBA relies on the definitions of "Hispanic," "Black," and "White" in the Office of Management and Budget's Directive No. 15, entitled "Race and Ethnic Standards for Federal Statistics and Administrative Reporting."

39.     Under Directive No. 15, "Hispanic" is someone "of Mexican, Puerto Rican, Cuban or South American or other Spanish culture or origin, regardless of race." The Directive does not define "culture or origin," although the SBA does consider individuals with family origins in Portugal or Spain to be Hispanic American.

40.     The Directive defines Black Americans as individuals with "origins in any of the black racial groups of Africa."

41.     SBA relies on Directive No. 15 despite the directive's exclusive purpose as a tool for record keeping, collection, and presentation of data on race and ethnicity. The directive states that its classifications "should not be interpreted as being scientific or anthropological in nature" and should not "be viewed as determinants of eligibility for participation in any Federal program."

42.     SBA can require at its discretion that anyone who claims to be a member of one of these groups enjoying presumptive disadvantage "demonstrate that he or she has held himself or herself out, and is currently identified by others, as a member of a designated group." 13 C.F.R. § 124.103.

## IV.     SBA's authority to make additional racial classifications

43.     Under SBA regulation, the SBA may designate "from time to time" any other "identifiable group" as presumptively socially disadvantaged. 13 C.F.R. § 124.103(b)(1), (d).

44.     Groups may petition the SBA to be added by regulation as a presumptively socially disadvantaged group. Such groups must present "substantial evidence that members of the group have been subjected to racial or ethnic prejudice or cultural bias." 13 C.F.R. § 124.103(d)(1). The SBA must then determine whether the group has "suffered prejudice, bias, or discriminatory practices" that resulted in "economic deprivation," and the disadvantages faced by the group have "produced impediments in the business world." *Id*. § 124.103(d)(2).

45.     The SBA has received a variety of such petitions, most of which it has rejected. For instance, the SBA has rejected petitions from Hasidic Jews, women, and Iranians, while it has accepted petitions from Asian Indians (the highest income racial group in the United States) and Sri Lankans.

46.     In 1987, the SBA rejected a petition from service-disabled veterans to be considered presumptively disadvantaged.

**Marty's experience applying for the 8(a) Program**

47.     Marty is of German and Scottish descent and therefore is not a member of a group that enjoys a presumption of social disadvantage under the statute and regulations.

48.     Thus, Marty must prove social disadvantage to the agency by a preponderance of the evidence.

49.     Those like Marty who are not presumed disadvantaged by virtue of their race or ethnicity alone must put forward evidence of the following:

50.     At least one "objective distinguishing factor that has contributed to social disadvantage, such as race, ethnic origin, gender, physical handicap," and so on;

51.     The social disadvantage must be based on treatment in "American society;"

52.     The disadvantage must be "chronic and substantial;"

53.     The disadvantage must have "negatively impacted on his or her entry into or advancement in the business world," such as experiences with education, employment, and business history. *See* 13 C.F.R. § 124.103(c).

54.     Marty applied in 2009 and 2016 for 8(a) Program eligibility. He presented evidence regarding his disabilities and the resulting disadvantages that he has faced in his career and personal life.

55.     SBA denied both applications. Marty sought reconsideration of the 2016 denial. After reconsideration was denied, Marty appealed to the SBA's Office of Hearings and Appeals, which affirmed denial in 2017.

56.     Marty's applications included evidence of multiple incidents of social disadvantage experienced in his business life. For example, he presented evidence that MJL had lost a contract with the New Jersey Department of Transportation after learning of Marty's physical disabilities. Likewise, Marty submitted that he had lost a contract with the United States Air Force for work at Langley Air Force Base because the contract officer knew of Marty's post-war combat depression.

57.     Marty has invested substantial money, time, and effort filing multiple applications for MJL to join the 8(a) Program, each time working with 8(a) Program representatives to ensure he provided appropriate documentation supporting his eligibility, in vain. The SBA has told him repeatedly that he does not qualify, despite its recognition of his disabilities and veteran status.

58.     It is broadly accepted by the U.S. Government and the public that people with disabilities suffer social disadvantage daily.

59.     As a general matter, veterans face social isolation and separation from mainstream American society. Sixty-four percent of veterans who served in combat feel isolated from civilian life. Eighty-five percent of veterans returning from wartime service carry home the burden of post-traumatic stress disorder. This further widens the gulf between mainstream America and the veterans who return home to a world where they struggle to find belonging and meaning.

60.     Marty has experienced these struggles personally. Due to the physical disabilities acquired during his military career, Marty cannot lift more than 25 pounds. He cannot raise his arms above his shoulders. He cannot sit for more than 45 minutes at a time without experiencing

excruciating back pain. He faces serious hearing loss that cannot be fixed with current hearing aid technology, affecting interactions with coworkers, customers, family, and friends.

61.     Likewise, Marty's psychological disabilities have affected all aspects of his life. These disabilities include depression, anxiety, impaired concentration, indecisiveness, low self-esteem, stress disorder, fatigue, hypersomnia, insomnia, anhedonia, restlessness, and significant weight loss or weight gain. Through grit and determination, Marty has succeeded despite these limitations, but they have imposed serious handicaps.

62.     Marty was denied eligibility for the 8(a) Program after collecting substantial evidence of these facts and demonstrating that he suffered from the well-documented social disadvantages stemming from his service-disabled veteran status.

63.     During this period, Marty became aware that while he was denied eligibility for the 8(a) Program, others were eligible based on their race without having to prove specific social disadvantages.

64.     Marty would have been accepted into the 8(a) Program without having to prove his social disadvantage if he belonged to one of the favored races listed in 15 U.S.C. § 631(f)(1)(B), (C) and 13 C.F.R. § 124.103(b)(1).

65.     The statute enshrining this racial preference, in consort with the broad authority delegated therein to the SBA to add new favored races or groups and set aside contracts as it deems fit, deprived MJL from standing on equal footing for 8(a) Program eligibility and competing for exclusive 8(a) contracting opportunities.

66.     While unfair, SBA's denial of Marty's applications is unsurprising. Very few 8(a) Program participants have achieved eligibility through demonstrating disadvantage by a preponderance of the evidence. Most program participants are those businesses that qualify due to

the racial presumptions in the statute and regulation. In the absence of the racial preference, SBA would accept more program participants based on individualized evidence of disadvantage.

**Injury to MJL**

67.     The statute and regulations described above bar MJL from standing on equal footing for 8(a) program eligibility and then from competing for exclusive 8(a) contracting opportunities based on race.

68.     Congress's purported delegation of choosing favored races for preferential treatment to the SBA further prevented MJL from competing on an equal footing for 8(a) Program eligibility and 8(a) contracts.

69.     In the absence of the statutory and regulatory racial presumption, MJL would have been equally situated for 8(a) Program eligibility with other businesses regardless of race. The racial presumption makes it less likely that the SBA will grant 8(a) eligibility to MJL.

70.     Because Marty is not a member of a group favored as socially disadvantaged by the SBA, MJL is unable to compete for contracts under the 8(a) Program that it could successfully procure and perform if allowed to do so.

71.     MJL also cannot access other benefits provided to 8(a) Program companies. These benefits include access to business development assistance, free training opportunities through the SBA, and federal surplus property access.

72.     MJL competes with 8(a) Program firms for valuable federal contracts and for third-party suppliers and other services.

73.     Because of 8(a) Program benefits, MJL is at a competitive disadvantage when competing for government contracts and third-party contracts with suppliers and other businesses. MJL is also at a competitive disadvantage in accessing the 8(a) Program itself, as it does not enjoy

a presumption of disadvantage, while firms owned and controlled by members of minority groups selected by the SBA do enjoy such a presumption.

74.    MJL is harmed by the unconstitutional racial classification scheme of the 8(a) Program and will suffer additional irreparable harm if the scheme remains in effect.

75.    MJL has no adequate remedy at law.

**CLAIM FOR RELIEF I: The presumption that designated groups are socially disadvantaged denies MJL equal protection in violation of the Fifth Amendment.**

76.    By presuming that certain races are socially disadvantaged, the statute and regulations that comprise the 8(a) Program (15 U.S.C. §§ 631, 637, and 13 C.F.R. § 124.103) deny MJL equal treatment for 8(a) Program eligibility, and further deny MJL the ability to bid on SBA contracts as a member of the 8(a) Program. The 8(a) Program likewise places MJL at a competitive disadvantage in the marketplace vis-à-vis businesses participating in the 8(a) Program. Because the 8(a) Program grants special preferences to businesses based on the race of the business owner, it must satisfy strict scrutiny. It fails that exacting standard. *See* 15 U.S.C. § 637(a); 15 U.S.C. § 631(f); 13 C.F.R. § 124.103(b).

77.    The SBA does not have a compelling governmental interest that justifies section 8(a)'s racial classification or the accompanying classification in 13 C.F.R. § 124.103(b).

78.    Even if the SBA had a compelling interest, the statutory racial classification is not narrowly tailored to meet any such interest.

79.    Neither is the regulatory racial classification narrowly tailored to meet a compelling interest.

80.    The SBA cannot produce evidence that shows "the most exact connection between justification and classification" required by strict scrutiny. *Fullilove v. Klutznick*, 448 U.S. 448, 537 (1980) (Stevens, J., dissenting). Defendants cannot show a relevant causal relationship

between their alleged evidence and the racial classification of the 8(a) Program, whether in terms of a "compelling interest" to enact the racial classification or "narrow tailoring" of its scope. Moreover, there is no causal relationship between the racial classification and any remedy for alleged discrimination.

81.     There is no "strong basis in evidence" demonstrating that the racial classification of section 8(a) is supported by a compelling interest, i.e., that it is supported by probative evidence satisfying strict scrutiny.

82.     The effort to alleviate the unproven effects of societal discrimination is not a compelling interest for purposes of strict scrutiny analysis of an alleged equal protection violation.

83.     In determining whether a particular contract in an industry is appropriate for the 8(a) Program, the SBA does not examine whether a particular racial group is underrepresented in that industry.

84.     The SBA has no evidence of any particular racial or ethnic group being underrepresented in the industry and other areas in which MJL competes for contracts.

85.     Even assuming there was evidence of underrepresentation of particular racial groups here, Defendants have no evidence that such underrepresentation was a consequence of discrimination either by the federal government or in which the federal government was a participant, passive or otherwise.

86.     In amending Section 8(a) of the Small Business Act in 1978, Congress did not produce or rely on any evidence that an underrepresentation of particular racial groups in federal government contracting was a consequence of discrimination either by the federal government or in which the federal government was a participant, passive or otherwise.

87.     Participation goals set for the 8(a) Program are not related to any evidence of the present effects of past discrimination in any particular industry or in the federal government at large.

88.     The reservation of industry contracts has not been necessary to achieve any reasonable goals set by Defendants or Congress.

89.     Because of the racial presumption of social disadvantage, most 8(a) Program contractors are owned and controlled by members of the racial or ethnic groups given special advantage by that presumption.

90.     The SBA's reserving certain industry contracts for the 8(a) Program is racially motivated.

**CLAIM FOR RELIEF II: The racial classifications established by the 8(a) Program and implementing regulations violate the Fifth Amendment's equal protection guarantee.**

91.     The 8(a) Program establishes by statute that groups presumed to be socially disadvantaged "include, but are not limited to, Black Americans, Hispanic Americans, Native Americans, Indian tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other minorities." 15 U.S.C. § 631(f)(1)(C).

92.     SBA has made racial classifications in addition to those established by Congress in the statute. *See* 13 C.F.R. § 124.103(b)(1).

93.     The statutory racial classifications, by including the catch-all "other minorities," are not narrowly tailored as required by the Fifth Amendment equal protection guarantee. Similarly, the SBA's regulatory decisions regarding which groups enjoy presumptively disadvantaged status and which do not are both under- and over-inclusive and thus are not narrowly tailored.

94.     The following is a non-exhaustive list of ways in which the SBA's racial classifications fail narrow tailoring:

95.     The list of countries of origin that qualify someone as an "Asian Pacific American" includes China but arbitrarily excludes Mongolia.

96.     The racial classification recognizes individuals from Pakistan as presumptively socially disadvantaged but arbitrarily excludes individuals from Afghanistan and other Middle Eastern and North African countries.

97.     The racial classification recognizes peoples from various Pacific Island nations such as Samoa and Fiji as presumptively disadvantaged but arbitrarily excludes aboriginal peoples from New Zealand and Papua New Guinea, such as the Maori, the indigenous Polynesian people of New Zealand.

98.     The racial classification recognizes peoples from Spain and Portugal (included within the meaning of "Hispanic") as presumptively disadvantaged but arbitrarily excludes all other European countries, including the poorest and most ethnically diverse countries in Europe.

**CLAIM FOR RELIEF III: The SBA's 8(a) Program rule claiming authority to decide which racial groups enjoy a presumption of social disadvantage (13 C.F.R. § 124.103(b)(1)) violates the Administrative Procedure Act (5 U.S.C. § 706(2)) because it exceeds statutory authority.**

99.     "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Thus, "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Publ. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The Administrative Procedure Act (APA) directs a court to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(C).

100.    The Small Business Act does not authorize the SBA to make racial classifications.

16

101.     The SBA nonetheless has made racial classifications in addition to those established by Congress in the statute. *See* 13 C.F.R. § 124.103(b)(1).

102.     The regulation makes a racial classification by determining which countries of origin qualify to make someone an "Asian Pacific American." Likewise, SBA regulation determines which aboriginal peoples are included as "Native Americans."

103.     The regulation also makes a racial classification by adding "Subcontinent Asian American" as a distinct race that enjoys the presumption of social disadvantage, with an accompanying description of which countries of origin qualify someone as a "Subcontinent Asian American."

104.     The regulation arrogates to the SBA the authority to designate "members of other groups from time to time" to be included in the list of presumptively disadvantaged minority groups.

105.     These racial classifications, as well as the power to create additional racial classifications as the agency sees fit, exceed statutory authority in violation of the Administrative Procedure Act.

106.     The agency also exceeds statutory authority by sub-delegating to other federal agencies the authority to choose at whim which, and how many, contracts will be fulfilled by 8(a) Program firms. The statute vests these administrative decisions exclusively in the hands of the SBA.

**CLAIM FOR RELIEF IV: The SBA's 8(a) Program Is an Unconstitutional Exercise of Legislative Power (Violation of the Nondelegation Doctrine, U.S. Const. art. I, § 1).**

107.     The APA directs courts to "hold unlawful and set aside" an agency's rule that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

108.     Article I, § 1, of the Constitution says: "All legislative Powers herein granted shall be vested in a Congress of the United States." Congress may not "abdicate or [] transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).

109.     The racial classification of the 8(a) Program is a facially unconstitutional delegation of legislative power to the SBA to the extent it delegates the authority to make or enact racial classifications as the SBA deems "necessary or appropriate" for "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities" or "other minorities" and delegates the authority to decide how to determine whether someone belongs to a particular minority group.

110.     As operated by the SBA, the 8(a) Program has no criteria by which the SBA can determine that specific racial groups should no longer have members presumed to be socially disadvantaged.

111.     In fact, although racial and ethnic groups have been added to those given presumptive 8(a) Program access, no racial or ethnic group has ever been removed from that list on the ground that the group is no longer adversely affected by the present effects of past discrimination.

112.     The 8(a) Program grants the SBA sweeping authority to select which contracts to reserve for the 8(a) Program as the SBA deems "necessary or appropriate." This language does not provide an intelligible principle by which to guide agency discretion and thus violates the nondelegation doctrine.

**CLAIM FOR RELIEF V: The SBA 8(a) regulations are arbitrary and capricious in violation of 5 U.S.C. § 706(a).**

113.   The APA requires a reviewing court to hold unlawful and set aside agency action that is arbitrary and capricious.

114.   Agency action must have "a rational connection between the facts found and the choice made." *Department of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (quotation omitted). While courts cannot substitute their own judgment for that of the agency's policy choices, such choices must remain "within the bounds of reasoned decisionmaking." *Id.*

115.   The racial classifications made by SBA in 13 C.F.R. § 124.103(b)(1), which add and define terms such as "Subcontinent Asian American" in a manner that is both under- and over-inclusive, do not fall "within the bounds of reasoned decisionmaking" and therefore are arbitrary and capricious.

116.   The method by which the agency determines whether someone is or is not a member of a minority group is likewise arbitrary and capricious. At its discretion, the SBA may require an 8(a) Program applicant to "demonstrate that he or she has held himself or herself out, and is currently identified by others, as a member of a designated group" that is presumed to be socially disadvantaged. In determining someone's racial or ethnic background, the agency's reliance on the subjective views of the applicant and an undefined set of "others" rather than objective considerations—such as national origin, cultural and linguistic background, family history, and so on—is arbitrary and capricious.

117.   SBA's reliance on Directive No. 15, "Race and Ethnic Standards for Federal Statistics and Administrative Reporting," is likewise arbitrary and capricious. The directive expressly warns that its classifications are not "scientific or anthropological in nature" and directs

agencies not to use the classifications "as determinants of eligibility for participation in any Federal program." Yet the SBA has done just that.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief:

A.     Declare that Section 8(a)'s racial classifications found in 15 U.S.C. §§ 637(a)(5), (8), and 631(f)(1)(b) and 13 C.F.R. § 124.103(a), (b)(1) are facially unconstitutional;

B.     Permanently enjoin enforcement and administration of 15 U.S.C. §§ 631(f)(1)(B) and 637(a)(5), (8) to the extent that they employ a racial preference in presuming that race alone qualifies an individual as socially disadvantaged and thus eligible to receive the benefits of the 8(a) Program;

C.     Permanently enjoin enforcement and administration of 15 U.S.C. § 637(a)(1) to the extent that it delegates legislative authority exclusively reserved to Congress by empowering the SBA to determine which contracts are awarded exclusively to 8(a) Program participants as the SBA deems "necessary or appropriate;"

D.     Permanently enjoin and set aside 13 C.F.R. § 124.103(a), (b) to the extent that it makes racial classifications and employs a racial preference in presuming that race alone qualifies an individual as socially disadvantaged and thus eligible to receive the benefits of the 8(a) Program;

E.     Award Plaintiffs the costs of this action and attorneys' fees and expenses; and

F.     Grant such other relief as the Court deems just and proper.

DATED:  January 18, 2023.

Respectfully submitted,

PACIFIC LEGAL FOUNDATION

      s/ Alison Somin

| | |
|---|---|
| Alison Somin | Ethan W. Blevins* |
| Virginia Bar No. 79023 | Utah Bar No. 16784 |
| 3100 Clarendon Blvd., Suite 1000 | Wencong Fa* |
| Arlington, VA 22201 | Cal. Bar No. 301679 |
| Telephone: (202) 888-6881 | 555 Capitol Mall, Suite 1290 |
| ASomin@pacificlegal.org | Sacramento, CA 95814 |
| | Telephone: (916) 419-7111 |
| | EBlevins@pacificlegal.org |
| | WFa@pacificlegal.org |

*Attorneys for Plaintiffs*
*Pro hac vice applications forthcoming