IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| Marty Hierholzer, an individual; MJL Enterprises, LLC, a Virginia corporation,<br><br>Plaintiffs,<br><br>v.<br><br>Isabel Guzman, in her official capacity as Administrator of the Small Business Administration; Small Business Administration,<br><br>Defendants. | Civil Case No. 2:23-cv-00024-RAJ-DEM |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 2

STANDARD OF REVIEW ..................................................................................................... 8

ARGUMENT .......................................................................................................................... 10

   I.    Plaintiffs Have Standing.................................................................................... 10

      A.    Plaintiffs plausibly allege an injury in fact ...................................... 10

      B.    Plaintiffs' injury is traceable to Defendants' enforcement of the 8(a) program.................................................................................... 12

      C.    Plaintiffs' injury is redressable by a favorable decision from this Court ....... 13

   II.    Plaintiffs Plausibly Allege that the Race-Based Presumptions Violate the Fifth Amendment ............................................................................................. 14

   III.    Plaintiffs Plausibly Allege that the Racial Classifications Violate the  Fifth Amendment.................................................................................................... 17

   IV.    Plaintiffs Plausibly Alleges a Violation of the Nondelegation Doctrine ........... 19

   V.    Plaintiffs Plausibly Allege That the SBA's Implementation of the 8(a) Program Violates Other Separation-of-Powers Principles ............................................. 23

   VI.    The Statute of Limitations Does Not Bar Plaintiffs' Request for Prospective Relief ............................................................................................ 25

CONCLUSION........................................................................................................................ 29

CERTIFICATE OF SERVICE ............................................................................................... 30

# INTRODUCTION

Plaintiff Marty Hierholzer is a small business owner that seeks the chance to compete for federal contracts without being discriminated against on the basis of race. But the Small Business Administration's Section 8(a) Business Development Program (the "8(a) program")—which ostensibly seeks to assist small businesses in procuring federal contracts—creates different rules for different business owners based on the business owner's race. That program, which provides a host of federal contracts set aside for program participants, is open only to entrepreneurs that the SBA considers "socially disadvantaged." Yet "social disadvantage" is a term bound with race: the 8(a) program *presumes* that some business owners are socially disadvantaged solely on account of their race or ethnicity. Business owners that do not belong to a favored racial group, however, must establish individual social disadvantage to the SBA's satisfaction—a demanding burden that many small business owners like Mr. Hierholzer are unable to surmount. As a result, Mr. Hierholzer and his business MJL Enterprises are frozen out of the 8(a) program and ineligible to receive federal contracts set aside for the program's participants.

The race-based measures of the 8(a) program violate the fundamental right of equality before the law embodied in the Due Process Clause of the Fifth Amendment to the United States Constitution. The Fifth Amendment requires the federal government to demonstrate that all racial classifications are narrowly tailored to further a compelling interest. But the government has provided no evidence of either narrow tailoring or a compelling interest in its motion—and such evidence would be improper at the pleadings stage. The SBA regulations in this case also run counter to important separation-of-powers

principles. There could hardly be a power that warrants more caution than the power to distribute benefits and burdens on the basis of race. Yet the SBA retains for itself the power to create favored racial groups at its whim—a power that Congress could not have granted the SBA without running afoul of the nondelegation doctrine. Defendants' Motion to Dismiss should be denied.

## STATEMENT OF FACTS

### *The 8(a) Program*

The 8(a) program seeks to "promote the business development" of small business owners who have suffered social and economic disadvantage. Compl. ECF No. 1 ¶ 4; 15 U.S.C. § 631(f)(2). In addition to providing technical, management, and other assistance to those who qualify, the 8(a) program both sets aside federal government contracts for which only participants in the program can compete and awards federal government contracts to program participants via sole-source awards, which are contracts awarded without any competition. Compl. ¶¶ 27–28; 15 U.S.C. §§ 631(f)(2), 637(a)(1)(A), (B); 13 C.F.R. § 124.501(b).

From fiscal years 2010–2021, the SBA awarded to program participants nearly 30 billion dollars per year in federal contracts. Congressional Research Service, *SBA's "8(a) Program": Overview, History, and Current Issues Congressional Research Service* 35 (updated Mar. 9, 2022).[1] Over 60 percent of these contracts were categorically unavailable to businesses that did not participate in the program either because the contracts were set

---

[1] Available at https://crsreports.congress.gov/product/pdf/R/R44844.

aside for bidding by only program participants or because they were awarded as sole source contracts to program participants without competitive bidding. *Id.*

Participation in the program is limited to business owners who are both socially and economically disadvantaged. First, the program considers business owners to be socially disadvantaged if they "have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities" and due to "circumstances beyond their control." 15 U.S.C. § 637(a)(5); 13 C.F.R. § 124.103(a). Second, among those socially disadvantaged individuals, program participation is limited to "[e]conomically disadvantaged individuals," which is defined by the Act as "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities." 15 U.S.C. § 637(a)(6)(A).

*Social Disadvantage Requirements*

The 8(a) program presumes that many business owners are socially disadvantaged solely on account of their race or ethnicity. The Act concludes in its preamble that "socially disadvantaged" persons include persons who are "Black Americans, Hispanic Americans, Native Americans . . . Asian Pacific Americans . . . and other minorities." 15 U.S.C. § 631(f)(C). The Act's findings have been codified by regulation to create a rebuttable presumption of social disadvantage for members of officially "designated groups." 13 C.F.R. § 124.103(b)(1). Members of "designated groups" are presumed to be socially disadvantaged unless the SBA receives "credible evidence to the contrary." *Id.* § 124.103(b)(3).

The SBA has also designated racial and ethnic groups whose members are entitled to the presumption of social disadvantage. For example, the SBA defines "Asian Pacific American" as including a person from "China (including Hong Kong)" but not a person with origins in Mongolia. *Id.* While the former is presumed socially disadvantaged, the latter is not. Still other ethnicities are not defined at all. For example, the regulation does not specify what subgroups are included within "Black American" or "Hispanic American." However, the SBA relies on the definitions of "Hispanic," "Black," and "White" in the Office of Management and Budget's Directive No. 15, entitled "Race and Ethnic Standards for Federal Statistics and Administrative Reporting." Compl. ¶ 38.

Additionally, under SBA regulation, representatives[2] of identifiable groups may petition the SBA to designate their *group* as presumptively socially disadvantaged by public comment rule making. 13 C.F.R. § 124.103(b)(1), (d). Such groups must present "substantial evidence that members of the group have been subjected to racial or ethnic prejudice or cultural bias." 13 C.F.R. § 124.103(d)(1). The SBA must then determine whether the group has "suffered prejudice, bias, or discriminatory practices" that resulted in "economic deprivation," and that the disadvantages faced by the group have "produced impediments in the business world." *Id.* § 124.103(d)(2). However, the SBA has rejected most petitions that it has received, including petitions from Hasidic Jews, women, disabled veterans, and Iranians. *See* Compl. ¶ 45; Congressional Research Service, *supra*, at 6 n.34;

---

[2] The regulatory text does not provide a definition of "representative." *See* 13 C.F.R. § 124.3. But it does not appear that "representative" means anything other than the party who petitions for a group's inclusion in the list of groups designated by 13 C.F.R. § 124.103(b)(1) as presumptively socially disadvantaged.

4

George R. La Noue & John C. Sullivan, *Gross Presumptions: Determining Group Eligibility for Federal Procurement Preferences*, 41 Santa Clara L. Rev. 103, 127–29 (2000). Ironically, the SBA has accepted petitions from Asian Indians (the highest income racial group in the United States) and Sri Lankans. Compl. ¶ 45.

Although a presumption of social disadvantage may be rebutted with "credible evidence," in practice a presumption of social disadvantage is determinative of social disadvantage. Because no applicant who is presumptively socially disadvantaged voluntarily presents evidence denying their own social disadvantage, the SBA can only obtain credible evidence if presented to the SBA by outside parties. Further, SBA regulations explicitly prohibit any party from challenging the eligibility of an 8(a) participant as part of a bid or contract protest either to the SBA or any administrative forum. 13 C.F.R. § 124.517(a).

By contrast, applicants belonging to racial groups that are not presumed to be socially disadvantaged must demonstrate that they have been socially disadvantaged by a preponderance of the evidence. 13 C.F.R. § 124.103(c)(1). Applicants must show they have (1) an objective distinguishing feature that has contributed to their social disadvantage, which must be (2) based on their experience in American society, (3) chronic and substantial, and (4) must have negatively impacted their entry into or advancement in the business world. *Id.* § 124.103(c)(2).

Although proving social disadvantage by a preponderance of the evidence is, in theory, a means of gaining entry into the 8(a) program, in practice very few 8(a) program

participants have achieved eligibility through demonstrating their individual social disadvantage to the SBA's satisfaction. Compl. ¶ 66.[3]

*Economic Disadvantage Requirements*

"Economically disadvantaged" is defined broadly enough that almost all small business concerns owned by a socially disadvantaged individual will be considered "economically disadvantaged" so long as the small business concern satisfies the SBA's income, net worth, and asset restrictions. Compl. ¶ 33. Specifically, in considering whether an applicant has "diminished capital and credit opportunities," the SBA will "examine factors relating to the personal financial condition of any individual claiming disadvantaged status, including income for the past three years . . . , personal net worth, and the fair market value of all assets." 13 C.F.R. § 124.104(c). Generally, an individual must have (1) a net worth of less than $850,000 (*id.* § 124.104(c)(2)); (2) average adjusted gross income of less than $400,000 over the three years preceding the submission of the 8(a) application (*id.* § 124.104(c)(3)); and (3) assets whose fair market value does not exceed $6.5 million (*id.* § 124.104(c)(4)).[4] A business owner need not recount "diminished

---

[3] Of 7,669 small businesses that submitted online applications in FY 2020 to participate in the 8(a) program, SBA approved only 591 of them. SBA Office of the Inspector General, *SBA's Business Development Assistance to 8(a) Program Participants*, Report Number 22-08, February 14, 2022, p. 9, https://www.oversight.gov/sites/default/files/oig-reports/SBA/SBA-OIG-Report-22-08.pdf. The Inspector General report does not however specify how many of the applications were received from presumptively socially disadvantaged individuals. Nor does the report state the reason the applications were rejected.

[4] The value of the applicant's primary personal residence and business are not included for calculating net worth. 15 U.S.C. § 637(a)(6)(E); 13 C.F.R. § 124.104(c)(2). Should the applicant's income exceed $850,000, a presumption of lack of economic disadvantage may be rebutted "by a showing that this income level was unusual and not likely to occur in the

capital and credit opportunities" in particular instances to establish his economic disadvantage. Indeed, the SBA recently eliminated the requirement to submit a narrative statement in support of a claim of economic disadvantage and instead rested the determination of social disadvantage "solely on an analysis of objective financial data relating to the individual's net worth, income and total assets." Congressional Research Service, *supra*, at 24.

*Marty Hierholzer and MJL Enterprises, LLC*

Mr. Hierholzer is a service-disabled veteran and owner of MJL Enterprises, LLC (MJL), which contracts with the government to provide various services and supplies. He served his country with distinction as a Navy deep sea diver, where he persevered through mental and physical injuries suffered in the line of duty. Compl. ¶ 2.

During his time in the Navy, Mr. Hierholzer recalls that military suppliers sometimes failed to provide adequate supplies. After retiring from the Navy, Mr. Hierholzer set out to fill the void and started his business, MJL Enterprises, LLC, to provide dependable supplies and services to the United States military. MJL is legally recognized as a small business under the terms of the 8(a) program. *Id.* ¶ 14. Today, the company provides a variety of goods and services—such as medical, maintenance, and repair equipment—to military bases and VA hospitals. *Id.* ¶ 22.

Mr. Hierholzer twice applied for MJL to be included in the 8(a) program. *Id.* ¶ 54. But he is of German and Scottish descent and is therefore not a member of a group that

---

future, that losses commensurate with and directly related to the earnings were suffered, or by evidence that the income is not indicative of lack of economic disadvantage." 13 C.F.R. § 124.104(c)(3)(i).

enjoys a presumption of social disadvantage under the 8(a) program. *Id.* ¶ 47. Mr. Hierholzer invested substantial money, time, and effort filing multiple applications for MJL to join the 8(a) program, each time working in vain with program representatives to ensure he provided appropriate documentation supporting his eligibility. *Id.* ¶ 57. The SBA denied both applications. *Id.* ¶ 55.

Moreover, Mr. Hierholzer meets all the requirements to be considered *economically* disadvantaged under the 8(a) program. He (1) has a net worth of less than $850,000; (2) has had an average adjusted gross income of less than $400,000 in each of the three prior years and in each of the three prior years preceding his application; and (3) holds assets whose fair market value does not exceed $6.5 million. *See* Hierholzer Decl. ¶¶ 4–6. Because Mr. Hierholzer meets the economic qualifications of the program, he would have been accepted into the 8(a) program without having to prove his social disadvantage if he belonged to one of the favored racial groups listed in 15 U.S.C. § 631(f)(1)(B), (C) and 13 C.F.R. § 124.103(b)(1). Compl. ¶ 64. But because he is not, he has been categorically excluded from the program—and the valuable opportunities that it provides for small business owners like him. Mr. Hierholzer brings this civil rights lawsuit to vindicate his constitutional rights and to compete on a race-neutral playing field.

## STANDARD OF REVIEW

On a Rule 12(b)(1) motion to dismiss for lack of standing, the Court may dismiss "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999) (quoting *Richmond, Fredericksburg & Potomac R. Co. v.*

*United States*, 945 F.2d 765, 768 (4th Cir. 1991)). The Court must assume the truth of Plaintiffs' factual allegations and draw any reasonable inferences in Plaintiffs' favor. *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013). Moreover, in determining whether the Court has jurisdiction, the Court may consider evidence outside of the pleadings. *See Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991); *see also Kerns v. United States*, 585 F.3d 187, 190 (4th Cir. 2009) (noting the Court may hold an evidentiary hearing to determine challenged jurisdictional facts). However, the Court attaches "a presumption of truthfulness" to the plaintiff's allegations where "the jurisdictional facts are intertwined with the facts central to the merits of the dispute." *Kerns*, 585 F.3d at 193.

When ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). To survive a Rule 12(b)(6) motion to dismiss, a "complaint must contain sufficient factual allegations, taken as true, 'to raise a right to relief above the speculative level' and 'nudge [the] claims across the line from conceivable to plausible.'" *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017) (quoting *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543 (4th Cir. 2013)).

## ARGUMENT

**I.      Plaintiffs Have Standing**

Article III standing requires (1) an "injury in fact" (2) that is "fairly traceable" to the defendant and (3) redressable by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs have adequately pled all three elements of standing in this case.

**A.      Plaintiffs plausibly allege an injury in fact**

Plaintiffs suffer an injury of a serious kind: the denial of equal treatment on the basis of race. The injury in fact in an equal protection case involving racial discrimination is not the ultimate denial of the benefit, but the erection of "a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) (*City of Jacksonville*); *see also Grutter v. Bollinger*, 539 U.S. 306, 317 (2003) (noting that the plaintiff "clearly has standing" to bring a lawsuit challenging the use of race as one of many factors in admissions decisions).

The government's argument to the contrary is both legally and factually wrong. The government is wrong on the law with respect to its assertion that Plaintiffs must point to a lost bid as a result of the 8(a) program. *See* Mot. to Dismiss ECF No. 20 at 17. In *City of Jacksonville*, the Supreme Court plainly rejected that argument, explaining that the injury in fact in an equal protection case involving racial discrimination is "the inability to compete on an equal footing in the bidding process, not the loss of a contract." 508 U.S. at 666. The government is also wrong in contending that the *City of Jacksonville* standard

applies only where the government's racial classifications serve as a "complete bar" to a benefit. *See* Mot. to Dismiss at 19. The Supreme Court routinely applies that standard in cases involving racial classifications—even where such race is determinative on some occasions and "play[s] no role" in others. *Grutter*, 539 U.S. at 316.

The government is factually wrong in its assertion that the race-based presumption of social disadvantage was not a complete bar to contracts set aside for 8(a) businesses. Had Mr. Hierholzer been a member of a favored racial group, he would have enjoyed presumptive status as a disadvantaged business and would have been able to obtain contracts set aside for such businesses. Yet because the government does not classify Mr. Hierholzer as a member of a favored racial group, he must make additional showings of individualized social disadvantage to the SBA's satisfaction, which he attempted to do twice—to no avail.

The government's assertion that Mr. Hierholzer did not lose any contracts as a result of his inability to participate in the 8(a) program has no legal relevance. It also strains credulity. The government's own declarant attests that MJL has routinely performed on government contracts over the span of several years. *See* ECF No. 20-2, Declaration of Sam Le ¶ 4 (noting that MJL has performed on thousands of federal contracts since 2006). It stands to reason MJL would have performed on 8(a) program contracts as well. Yet the 8(a) program's race-based presumption of social disadvantage has frozen MJL out of contracts set aside pursuant to that program.

**B.      Plaintiffs' injury is traceable to Defendants' enforcement of the 8(a) program**

Plaintiffs' injury is traceable to Defendants' enforcement of the 8(a) program in multiple ways. The program's race-based presumptions impose hurdles for Mr. Hierholzer's participation in the 8(a) program because of his race. Nearly all program participants enter the program without having to demonstrate social disadvantage because the owner is presumptively disadvantaged on account of race. Yet because Mr. Hierholzer is a member of a disfavored racial group under the 8(a) program, he must make a showing of individual social disadvantage. Therefore, the government misses the point when it asserts that Plaintiffs' injury stems from the SBA's denial of their application to be considered socially disadvantaged. Plaintiffs should never have to make the showing in the first instance. The SBA would have never been in the position to consider an application from Mr. Hierholzer but for the 8(a) program's race-based presumptions.

The government further argues that Plaintiffs' injury is not traceable to the race-based presumptions challenged in this case because Plaintiffs could not meet the requirement for "economic disadvantage." But that is both inaccurate and irrelevant. It is inaccurate because Plaintiffs do in fact meet the regulatory requirements for economic disadvantage, which is determined by a business owner's personal net worth, adjusted gross income, and assets. *See* 13 C.F.R. § 124.104; *see* Hierholzer Decl. ¶¶ 4–6 (attesting that Hierholzer meets the financial requirements to be considered economically

disadvantaged).[5] It is irrelevant because the 8(a) program plainly sets aside a portion of contracts for disadvantaged businesses—and that set-aside is based on race. Therefore, any business—economically disadvantaged or not—would have standing to raise an equal protection challenge to racial set-asides. *See Dynalantic Corp. v. Department of Defense*, 115 F.3d 1012, 1016 (D.C. Cir. 1997) (*Dynalantic I*) (noting that the business's injury stems from the fact that "the *entire* 8(a) program—which injures it by foreclosing business opportunities—is infected by unconstitutional race consciousness").

### C.    Plaintiffs' injury is redressable by a favorable decision from this Court

The government's arguments on redressability simply repeat the mistake it makes in its other standing arguments. The government contends Plaintiffs have not plausibly alleged that MJL would be eligible for the 8(a) program if the race-based presumption were removed, and that Plaintiffs have not plausibly alleged that they would experience any beneficial change from the elimination from the presumption.

The government's analysis again reflects a fundamental misunderstanding of equal protection law. The race-based presumptions impose additional burdens on business owners who the government considers to be members of disfavored racial groups. Unlike business owners that the government considers presumptively disadvantaged on the basis of race, business owners like Mr. Hierholzer must make additional showings of individualized social disadvantage—which ultimately exclude MJL from participation in

---

[5] The government's argument puts the cart before the horse because an economically disadvantaged individual must first be deemed socially disadvantaged. *See* 15 U.S.C. § 637(a)(6)(A) (defining "economic disadvantaged individuals" as a subset of "socially disadvantaged individuals"); 13 C.F.R. § 124.104(a) (same).

the 8(a) program. Because the race-based presumptions "prevent[] [MJL] from" competing for government contracts "on an equal basis," it follows that "a judicial decree directing the city to discontinue its program would 'redress' the injury." *City of Jacksonville*, 508 U.S. at 666 & n.5; *see also Heckler v. Mathews*, 465 U.S. 728, 740 (1984) ("[W]hen the right invoked is that to equal treatment, the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class.") (internal quotation marks omitted).[6]

## II.    Plaintiffs Plausibly Allege that the Race-Based Presumptions Violate the Fifth Amendment

The Due Process Clause of the Fifth Amendment to the United States Constitution contains an equal protection component applicable to the federal government. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). "[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).

Both the statutes and the implementing regulations employ racial classifications. The government is therefore correct in readily conceding that the regulations are subject to strict scrutiny. *See* Mot. to Dismiss at 23 & n.7. The government is incorrect, however, to depart from the government's longstanding position and to suggest that the statutes

---

[6] In practice, MJL would likely benefit from either remedy that would cure Plaintiffs' equal protection violation. If the Court requires the government to extend the presumption, MJL would be presumptively eligible to participate in the 8(a) program. If the Court eliminates the presumption, there would be many fewer 8(a) participants—which reduces the possibility that any particular contract would be awarded under the 8(a) program. *Dynalantic I*, 115 F.3d 1012.

challenged in this case are only subject to rational basis review. *See id.* at 23 & n.9. To begin, the statutory framework belies the government's assertion that the statute benefits only "individuals who have experienced discrimination," *id.* at 22. On the contrary, the statute *presumes* that all members of preferred racial groups have suffered discrimination, and affords them a lighter burden to establish disadvantage under the 8(a) program.

The statutes authorizing the 8(a) program are subject to strict scrutiny because they distribute benefits and burdens on the basis of race. *Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007). Section 631, for instance, reflects Congress's determination that "many [ ] persons are socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices" and that "such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans, Indian tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other minorities." 15 U.S.C. § 631(f)(1)(B)–(C).

This Court should decline the government's invitation to gloss over these express racial classifications. *See* Mot. to Dismiss at 22–23. The government relies on the D.C. Circuit's decision in *Rothe Development, Inc. v. U.S. Department of Defense*, in which a divided panel refused to apply strict scrutiny because the express classifications were "located in the findings section of the statute." 836 F.3d 57, 66 (D.C. Cir. 2016). But as Judge Henderson noted in dissent, a statutory preamble "may aid in achieving a 'general understanding' of the statute" and illuminate otherwise ambiguous statutory commands. *See id.* at 79–80 (Henderson, J., dissenting).

15

Because strict scrutiny places the burden squarely on the government to produce evidence that its racial classifications are narrowly tailored to achieving a compelling government interest, this Court should reject the government's efforts to dismiss the case at the pleadings stage. Plaintiffs have pled a plausible claim that the statutes and regulations challenged in this case cannot withstand strict scrutiny. The government offers no evidence in its motion to sustain its burden of proving that the classifications employed by the 8(a) program serve a compelling interest in remedying past discrimination. *See Parents Involved*, 551 U.S. at 720 (noting that the government defendants had failed to demonstrate a compelling interest in "remedying the effects of past intentional discrimination").[7]

The government fares even worse on narrow tailoring. Although narrow tailoring requires the government to show "the most exact connection between justification and classification," *Fullilove v. Klutznick*, 448 U.S. 448, 537 (1980) (Stevens, J., dissenting), the 8(a) program gives the SBA the authority to set aside contracts for "disadvantaged" businesses in an industry without any evidence that discrimination has ever existed in that industry or whether the individual bidding on the contract has ever been discriminated against. The implementing regulation similarly permits gratuitous benefits to individuals from Burma, Brunei, Macao, and anywhere else the SBA may wish to designate without

---

[7] The government's motion reflects significant confusion about the distinction between facial and as-applied challenges. Yet as the Fourth Circuit explained in its recent decision in *White Coat Waste Project v. Greater Richmond Transit Company*, 35 F.4th 179, 204–05 (4th Cir. 2022), where an as-applied challenge "depends on the identity or circumstances of the plaintiff," a facial challenge does not. The constitutionality of the statutes and regulations challenged in this case does not depend on Plaintiffs' identity but on the fact that the government has failed to justify a program that distributes benefits and burdens on the basis of race.

any evidence that a small business owner belonging to one of those groups had even competed for a contract in that industry. *See* 13 C.F.R. § 124.103(b), (d). That is the hallmark of an insufficiently tailored program. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 506 (1989) (faulting the City of Richmond for providing preferences for "Eskimo, or Aleut persons" even though "[i]t may well be that Richmond has never had an Aleut or Eskimo citizen").

Finally, the government asks this Court to dismiss the case based on the decision from an out-of-circuit district court in *DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237 (D.D.C. 2012) (*DynaLantic II*). This Court is not bound by the analysis in *DynaLantic II*, which if anything, favors *denying* the government's motion in this case. The court in *DynaLantic II* reached its decision on cross-motions for summary judgment— only after the defendants had submitted evidence to meet their burden of establishing a compelling interest in remedying discrimination (which the government has not done here) and after the plaintiffs had a chance to present evidence to rebut the government's initial showing (which Plaintiffs here have not had the opportunity to do). Therefore, *DynaLantic II* underscores that Plaintiffs' claims must move past the pleadings stage.

### III. Plaintiffs Plausibly Allege that the Racial Classifications Violate the Fifth Amendment

"It is a sordid business, this divvying us up by race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part, concurring in the judgment in part, and dissenting in part). Yet the government fails to even respond to Plaintiffs' second claim that the racial classifications established by the 8(a) program

and implementing regulations violate the Fifth Amendment's equal protection guarantee. *See* Compl., Claim II.

The statutes create arbitrary racial classifications that say nothing about any business owner's individual characteristics. The statute presumes social disadvantage for "Hispanic Americans," which some scholars have described as "an artificial rubric for a set of diverse populations that resulted from the mixture of indigenous American peoples, African slaves, and Europeans." Jonathan Borak et al., *Who is Hispanic? Implications for Epidemiologic Research in the United States*, 15 Epidemiology 240, 241 (2004); *see also* Jack D. Forbes, *The Hispanic Spain: Party Politics and Governmental Manipulation of Ethnic Identity*, 19 Latin Am. Persp. 59, 67–68 (1992) (asserting that "the Hispanic concept is a Nixon-engineered political device"). The term "Asian Pacific American" is similarly broad and arbitrary. According to the SBA, that term includes people from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China (including Hong Kong), Taiwan, Laos, Cambodia, Vietnam, Korea, The Philippines, U.S. Trust Territory of the Pacific Islands, Republic of the Marshall Islands, Federated States of Micronesia, the Commonwealth of the Northern Mariana Islands, Guam, Samoa, Macao, Fiji, Tonga, Kiribati, Tuvalu, and Nauru. *See* 13 C.F.R. § 124.103(b)(1). As Justice Alito aptly noted, it "would be ludicrous to suggest that all of these [individuals] have similar backgrounds and similar . . . experiences to share." *Fisher v. Univ. of Texas*, 579 U.S. 365, 414 (2016) (Alito, J., dissenting). In all, the statutory classifications are too crude to meet the

constitutional demand for "the most exact connection between justification and classification." *Fullilove*, 448 U.S. at 537 (Stevens, J., dissenting). [8]

The regulations fare no better. They assert that a Chinese business owner, but not a Mongolian business owner, is an Asian Pacific American that is presumed socially disadvantaged. The SBA recognizes individuals from Pakistan as presumptively disadvantaged, but arbitrarily excludes individuals from Afghanistan. Without searching judicial inquiry, there is no way to determine whether these seemingly arbitrary distinctions are "in fact motivated by illegitimate notions of racial inferiority or simple racial politics." *Croson*, 488 U.S. at 493.

## IV.     Plaintiffs Plausibly Alleges a Violation of the Nondelegation Doctrine

Article I, § 1, of the Constitution states: "All legislative Powers herein granted shall be vested in a Congress of the United States." Under the nondelegation doctrine, Congress may not "abdicate or [] transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935). When Congress confers decisionmaking authority upon agencies, Congress must "lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 472 (2001) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

---

[8] The statutes also permit race-based preferences for "other minorities" unenumerated in the statutory text. This preference suffers from a similar problem in that it provides gratuitous benefits to individuals that have nothing in common besides their membership in a crudely defined racial group.

Plaintiffs plausibly pled that SBA lacks an "intelligible principle" to select which contracts to reserve for the 8(a) program as the SBA deems "necessary or appropriate" under 15 U.S.C. § 637(a)(1)(B). The Supreme Court's decision in *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), is illustrative. There, the Court held that a provision of the National Recovery Act was an unconstitutional delegation of legislative power because it gave unfettered discretion to the President to decide whether and under what conditions to prohibit the transport of hot oil. *Id.* at 430. Notwithstanding the general goal of improving American economic conditions, the Act was unconstitutional because Congress failed to make any policy decision governing this issue. *Id.* at 416–18. The President was simply free to weigh competing policy considerations as he deemed "fit." *Id.* at 415.

As in *Panama Refining*, the delegation of authority to the SBA to set aside certain federal contracts to the 8(a) program fails to provide an intelligible principle by which to guide agency discretion and thus violates the nondelegation doctrine. The government retorts that "the language in 15 U.S.C. § 631(f)(1) states the findings made by Congress in enacting the 8(a) program and expresses the policy behind the program, both of which serve to guide SBA in its implementation of the 8(a) program." Mot. to Dismiss at 21. But the findings in 15 U.S.C. § 631(f)(1), and particularly in 15 U.S.C. § 631(f)(1)(F)–(G), only state that procurement from socially and economically disadvantaged businesses can help ameliorate their condition and benefit the United States. These findings provide no guidance on how to allocate contracts. They do not, for example, provide any guidance on what kinds of contracts (e.g., I.T. service contracts or office supplies contracts) should be allocated for the 8(a) program to purportedly remedy discrimination in each particular

industry. In short, the SBA lacks any guidance on the "circumstances and conditions" by which contracts should be set aside for the 8(a) program. *Panama Ref. Co.*, 293 U.S. at 430. To the extent that *Whitman* requires there to be "literally no guidance" for a statute to violate the nondelegation doctrine, the 8(a) program's set-aside provisions are precisely the provisions *Whitman* had in mind. Mot. to Dismiss at 20; 531 U.S. at 474.

Moreover, even if the limitation of "necessary and appropriate" could be said to provide guidance, such a limitation is "no more precise a standard" than that provided by a limitation of "fair competition," which the Court in *Whitman* noted was insufficient to "confer[] authority to regulate the entire economy." 531 U.S at 474. Although the SBA does not regulate the entire economy, the value of all contracts awarded through the 8(a) set-aside program is significant—$8.7 billion in FY 2021. Congressional Research Service, *supra*, at Summary.

The cases the SBA cites as examples of permissible delegations of authority are distinguishable. For example, *Whitman* involved a nondelegation challenge to the Clean Air Act's delegation of authority to EPA to set national ambient air quality standards for ozone and particulate matter at a level "requisite to protect public health." The delegation involved was much narrower than the delegation at issue in § 637(a)(1)(B). 531 U.S. at 472. In *Whitman*, the EPA's discretion involved only setting a numerical level of allowed particulate matter. Although the EPA's decision to set the air pollution level was undoubtedly based on complex factors, the delegation itself to the EPA was narrow. By contrast, the delegation to the SBA to set aside contracts for the 8(a) program as "necessary and appropriate" involves far more discretion—the SBA has discretion to set aside

contracts from *any* industry and for *any* particular good or service. Plaintiffs have plausibly alleged a nondelegation claim.

Plaintiffs also plausibly pled that the 8(a) program is a facially unconstitutional delegation of legislative power to the SBA to the extent it delegates the authority to make or enact racial classifications as the SBA deems "necessary or appropriate" and delegates the authority to decide how to determine whether someone belongs to a particular minority group. Compl. ¶ 109.[9]

Here, significant aspects of the 8(a) program lack any principle whatsoever, let alone an intelligible principle. As operated by the SBA, the 8(a) program has no criteria by which the SBA can determine that specific racial groups should no longer have members presumed to be socially disadvantaged. Although Defendants point to Congress's findings, these findings, to the extent they form any principle, only inform which groups should be *included at the time* Congress created the program. Mot. to Dismiss at 21. Congressional findings provide no principle as to which groups should be *removed*. Indeed, although some racial and ethnic groups have been added to those presumptively considered socially disadvantaged, no racial or ethnic group has ever been removed from that list on the ground that the group is no longer adversely affected by the present effects of past discrimination. Yet without the ability to remove groups whose inclusion is no longer needed to serve a remedial interest, the 8(a) program cannot satisfy strict scrutiny under the Fifth

---

[9] Significantly, plaintiffs challenge both 15 U.S.C. § 631 *et seq. and* 13 C.F.R. § 124.1 *et seq.* Therefore, because the plaintiff in *Rothe Development* challenged the racial classification only in the statute and not in the regulation, *Rothe Development* is distinguishable and of limited relevance to this nondelegation challenge. 836 F.3d at 62.

Amendment. *Adarand Constructors*, 515 U.S. at 238 (strict scrutiny requires the Court to ask "whether the program was appropriately limited such that it 'will not last longer than the discriminatory effects it is designed to eliminate'") (quoting *Fullilove*, 448 U.S. at 513 (Powell, J., concurring)).

Additionally, the SBA lacks any principle, intelligible or not, for designating groups who are presumed to be socially disadvantaged.[10] The Administrator of the SBA is given authority to designate any group as socially disadvantaged as "necessary or appropriate." 15 U.S.C. § 637(a)(1). The Administrator has wide discretion to grant racial groups the presumption of social disadvantage—discretion that is either virtually unfettered (if this Court agrees with Plaintiffs that the statutory preamble in Section 631 is relevant in determining the bounds of the 8(a) program) or literally unfettered (if this Court takes the government's view that the Court should disregard the language in Section 631). As discussed in the following section, the discretion has led to arbitrary distinctions on which groups are entitled to the presumption of social disadvantage, and which groups are not.

**V.     Plaintiffs Plausibly Allege That the SBA's Implementation of the 8(a) Program Violates Other Separation-of-Powers Principles**

The government fails to even address Plaintiffs' other separation-of-powers claims. *See* Compl. Claims for Relief III & V. Plaintiffs plausibly allege that the SBA's designation of racial and ethnic groups granted the presumption of social disadvantage exceeds

---

[10] Even if the relevant statutes provided an intelligible principle, the power to make racial classifications squarely fall within the type of case in which "the significance of the delegated decision is simply too great for the decision to be called anything but legislative." *Whitman*, 531 U.S. at 487 (Thomas, J., concurring).

statutory authority in violation of the Administrative Procedure Act (APA). *See id.*, Claim for Relief III. As an agency, the SBA "has no power to act . . . unless and until Congress confers power upon it." *La. Publ. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Accordingly, the APA directs courts to set aside agency action that is "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(C).

Here, Congress found that socially disadvantaged groups "include, but are not limited to, Black Americans, Hispanic Americans, Native Americans, Indian tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other minorities." 15 U.S.C. § 631(f)(1)(C).[11] Yet SBA has designated numerous "socially disadvantaged" groups on grounds of race and ethnicity. For instance, although the statute affords racial preferences for Asian Pacific Americans, the SBA has expanded the same preferences to groups nowhere mentioned in the statute—such as subcontinent Asian Americans. *See* 13 C.F.R. § 124.103(b)(1). The SBA grants preferences in arbitrary ways. It recognizes a person from China, but not a person from Mongolia, as an Asian Pacific American. *See id.* Its regulations grant the presumption of social disadvantage to a business owner from Pakistan but not one from Afghanistan. *See id.*

The SBA's regulations also violate the APA because they are arbitrary and capricious. *See* Compl. Claim for Relief V. As the Supreme Court recently explained, courts must ensure that agencies "articulate[] 'a satisfactory explanation' for [their]

---

[11] As noted above, the government's position that the statute is race-neutral is wrong. But if the Court were to adopt the government's gloss on the statutory language, that would only exacerbate the SBA's problems under the Administrative Procedure Act because *none* of the racial or ethnic groups designated by the SBA to receive preferential treatment would have been granted such preferential treatment by statute.

decision[s]" and "remain[] within the bounds of reasoned decisionmaking." *Department of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019). The SBA flunks that standard in several respects. As noted above, the SBA draws unreasoned distinctions between business owners from China and business owners from Mongolia; entrepreneurs from Pakistan and entrepreneurs from Afghanistan. What's more, the SBA arbitrarily relies on Directive 15, "Race and Ethnic Standards for Federal Statistics and Administrative Reporting," which itself instructs that its classifications are not "scientific or anthropological in nature," and warns federal agencies against using them. The SBA has failed to provide a satisfactory explanation for its racial and ethnic classifications, and the government offers none in this case.

## VI. The Statute of Limitations Does Not Bar Plaintiffs' Request for Prospective Relief

The statute of limitations does not bar Plaintiffs' request for injunctive and declaratory relief both because the relief they seek is prospective and the injury they have suffered is continuing. As long recognized by the Fourth Circuit, "[t]he continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations." *Va. Hosp. Ass'n v. Baliles*, 868 F.2d 653, 663 (4th Cir. 1989) (alteration in original; citation omitted). "A continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *Nat'l Advert. Co. v. City of Raleigh*, 947 F.2d 1158, 1166–67 (4th Cir. 1991) (quoting *Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir. 1981)).

Thus, where a plaintiff challenges the constitutionality not of a particular state action that was completed in the past, but of a state law or policy that is currently and will continue to be enforced in the future, the continuing violation doctrine tolls the statute of

limitations. *National Association for Rational Sexual Offense Laws v. Stein*, No. 1:17CV53, 2019 WL 3429120, at *9 (M.D.N.C. July 30, 2019) ("[B]ecause Plaintiffs in this action are seeking prospective relief for the continued enforcement of allegedly unconstitutional amendments to the registry law, the statute of limitations does not bar Plaintiffs' claims."); *see also Williams v. Norfolk & W. Ry. Co.*, 530 F.2d 539, 542 (4th Cir. 1975) (holding in an employment discrimination case that plaintiffs "challenge this continuous discrimination rather than any single discriminatory act").

The government's claim that "[u]nder federal law a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action," *Nasim v. Warden, Maryland House of Correction*, 64 F.3d 951, 955 (4th Cir. 1995), only applies when the plaintiff alleges a past and non-continuing injury. When a plaintiff challenges the constitutionality of a statute, "whose continued application works an ongoing constitutional violation," the ordinary accrual rule does not apply but rather the clock "starts to run anew, every day that the statute applies." *Stein*, 2019 WL 3429120, at *9 (quoting *Wallace v. New York*, 40 F. Supp. 3d 278, 302 (E.D.N.Y. 2014)); *see also DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) ("[W]hen a harm has occurred more than once in a continuing series of acts or omissions, a plaintiff . . . may allege a 'continuing violation' for which the statute of limitations runs anew with each violation.").

By contrast, in each case cited by the government, the plaintiffs' claims related to a "past and non-continuing injury." Mot. to Dismiss at 25–27. For example, in *Nasim v. Warden, Maryland House of Correction*, the plaintiff alleged that the defendants exposed

26

him to asbestos in his prison cell while he was incarcerated from April 1983 to November 1989, which exposure led to specific personal injuries such as lung disease and skin lesions. 64 F.3d at 952. Yet in *Nasim*, the asbestos was removed in 1989 and Nasim's action was not filed until 1992, "almost four years *after* the alleged asbestos removal." *Id.* at 953 (emphasis added). Likewise, *Johnson v. Jessup* is entirely distinguishable because the plaintiffs there challenged the constitutionality of a "single act," specifically the state's failure to provide notice prior to revoking their drivers' licenses. 381 F. Supp. 3d 619, 636 (M.D.N.C. 2019). As the court noted, the "continuing violation" exception to statutes of limitations "is occasioned by continual unlawful acts, not continual ill effects from an original violation," *Johnson*, 381 F. Supp. 3d at 636 n.19 (quoting *Raleigh*, 947 F.2d at 1166). Because the plaintiffs' claim was that "it is unconstitutional for the DMV to revoke their driver's licenses for failure to pay fines and costs without first affirmatively determining that they have the ability to pay," the plaintiffs' claims relate entirely to acts that occurred in the past—their licenses have already been revoked and, *ipso facto*, their same licenses cannot continue to be revoked by new acts. *Johnson*, 381 F. Supp. 3d at 623.

The fact that Mr. Hierholzer's applications were denied in 2009 and 2016 is irrelevant because, unlike the plaintiffs in *Johnson*, Mr. Hielholzer could apply again for acceptance into the 8(a) program should the racial presumption be struck down. Mr. Hierholzer does not challenge the ill effects of his denial from the 8(a) program, such as his lack of access to the program's many benefits. *See* Compl. ¶¶ 71–73. Nor does Mr. Hierholzer seek to retroactively force the SBA to accept his application, unlike the

plaintiffs in *Johnson* who sought a preliminary injunction "to bar the DMV from revoking licenses." *Johnson*, 381 F. Supp. 3d at 638; Compl. Prayer for Relief ¶¶ A–F.

Instead, Mr. Hierholzer challenges his lack of *opportunity* to compete on an equal footing for eligibility into the 8(a) program and contracts exclusively allocated to the program as applicants who are automatically presumed to be socially disadvantaged because of their race. *See* Compl. ¶¶ 67–68. This is precisely how the court in *Dynalantic I* described the petitioner's injury caused by the 8(a) program. *Dynalantic I*, 115 F.3d at 1016 ("Dynalantic's injury is its lack of opportunity to compete for Defense Department contracts reserved to 8(a) firms."); *see also City of Jacksonville*, 508 U.S. at 666 (contractor's injury in challenge to a minority set-aside program was "the inability to compete on an equal footing in the bidding process, not the loss of a contract"). As the Supreme Court explained in *Regents of University of California v. Bakke* when striking down the University of California's admissions program that set-aside seats for which only members of certain races were eligible: "[Applicants who are not the designated race] are never afforded the chance to compete with applicants from the preferred groups for the special admissions seats. At the same time, the preferred applicants have the opportunity to compete for every seat in the class." 438 U.S. 265, 319–20 (1978).

Like the contractors in *Dynalantic I* and *City of Jacksonville*, and like students in *Bakke* and *Grutter*, Mr. Hierholzer simply seeks to compete on equal footing as those 8(a) program participants who were presumed to be socially disadvantaged. Because Mr. Hierholzer challenges the continued implementation of the racial presumption, each

time the SBA employs its racial classifications constitutes a new act. Accordingly,

Mr. Hierholzer's claims are not barred by the statute of limitations.

## CONCLUSION

Defendants' Motion to Dismiss should be denied.

DATED:  April 7, 2023.

Respectfully submitted,

<table>
<tr><td> s/ Alison Somin</td><td> s/ Wencong Fa</td></tr>
<tr><td>Alison Somin</td><td>Wencong Fa*</td></tr>
<tr><td>Virginia Bar No. 79023</td><td>Cal. Bar No. 301679</td></tr>
<tr><td>PACIFIC LEGAL FOUNDATION</td><td>Joshua P. Thompson*</td></tr>
<tr><td>3100 Clarendon Blvd., Suite 1000</td><td>Cal. Bar No. 250955</td></tr>
<tr><td>Arlington, VA 22201</td><td>PACIFIC LEGAL FOUNDATION</td></tr>
<tr><td>Telephone: (202) 888-6881</td><td>555 Capitol Mall, Suite 1290</td></tr>
<tr><td>Fax: (916) 419-7747</td><td>Sacramento, CA 95814</td></tr>
<tr><td>ASomin@pacificlegal.org</td><td>Telephone: (916) 419-7111</td></tr>
<tr><td></td><td>Fax: (916) 419-7747</td></tr>
<tr><td></td><td>WFa@pacificlegal.org</td></tr>
<tr><td></td><td>JThompson@pacificlegal.org</td></tr>
</table>

*Attorneys for Plaintiffs*
*Pro hac vice

29

**CERTIFICATE OF SERVICE**

I hereby certify that on April 7, 2023, I submitted the foregoing to the Clerk of the

Court via the District Court's CM/ECF system, which will provide notice of the submission

of this document to all counsel of record.

s/ Alison Somin
Alison Somin
Virginia Bar No. 79023
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
Fax: (916) 419-7747
ASomin@pacificlegal.org

*Attorney for Plaintiffs*
